IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


GAYLA J. HATFIELD                                                                    PLAINTIFF

                    v.                              Civil No. 10-2055

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                        DEFENDANT

**MEMORANDUM OPINION**

I.      **Factual and Procedural Background**

        Plaintiff, Gayla J. Hatfield, appeals from the decision of the Commissioner of the Social

Security Administration denying her application for disability insurance benefits ("DIB"), pursuant

to §§ 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d)[hereinafter

"the Act"].

        Plaintiff protectively filed her DIB application on April 10, 2008, alleging a disability onset

date of February 14, 2007, due to fibromyalgia, arthritis, diabetes mellitus, irritable bowel syndrome

("IBS"), anxiety, depression, migraines, Hashimoto's disease,[1] and back, shoulder, and neck pain

from previous injuries.  Tr. 45-46, 50, 99-101, 117, 122.  At the time of the onset date, Plaintiff was

forty six years old with a high school education.  Tr. 25-26, 117, 129, 186, 453.  She has past

relevant work as a data entry clerk.  Tr. 56, 123-124, 139-146, 183-184, 453-454.

        Plaintiff's applications were denied at the initial and reconsideration levels. Tr. 59-61, 63-64.

At Plaintiff's request, an administrative hearing was held on March 12, 2009.  Tr. 19-44.  Plaintiff

---

        [1] Hashimoto's Thyroiditis is characterized by chronic autoimmune inflammation of the thyroid with
lymphocytic infiltration.  Findings include painless thyroid enlargement and symptoms of hypothyroidism.  Lifelong
thyroxine replacement is often required.  *The Merck Manual of Diagnosis and Therapy*, 1194-1195 (18th ed. 2006).

was present at this hearing and represented by counsel.  Tr. 19.  The ALJ rendered an unfavorable

decision on October 2, 2009, finding that Plaintiff was not disabled within the meaning of the Act.

Tr. 47-58.  Subsequently, the Appeals Council denied Plaintiff's Request for Review on March 26,

2010, thus making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.  Plaintiff now

seeks judicial review of that decision.

## II.   <u>Medical History</u>

Plaintiff has a history of non-insulin-dependent diabetes mellitus, Hashimoto's disease,

chronic back and neck pain, migraines, IBS, and depression.  Tr. 418-437.

From May 2006 through July 2007, Plaintiff received extensive treatment at Clouse

Chiropractic Family Practice for residual neck and back pain associated with a motor vehicle

accident that occurred in December 2005.  Tr. 194-250, 251-380.  Following the accident, Plaintiff

was assessed with sprain/strain of the cervical, thoracic, and lumbar spine, nerve injury of the

brachial plexus with radiculopathy into the right and left upper extremities, and traumatic myalgia.

Tr. 236.  Her treatment consisted of spinal adjustments, soft tissue massage, traction, electrical

stimulation, trigger point therapy, hydrotherapy, and cryotherapy, with some improvement.  Tr. 194-

250, 251-380.  On September 20, 2006, Lance Clouse, D.C., noted that Plaintiff could expect

intermittent mild neck pain, headaches, reduced cervical range of motion, and accelerated

degeneration.  Tr. 237.  At this time, she had moderate neck pain with continued radiculopathy of

the left upper extremity, grade II tenderness, edema, paraspinal hypertonicity, and joint fixations in

the cervical and upper thoracic spine, and moderately decreased range of motion upon cervical

flexion, extension, lateral flexion, and rotation.  Tr. 237.  However, Dr. Crouse found that Plaintiff

improved 60-70% following the accident.  Tr. 237.  He recommended further chiropractic treatment,

possibly indefinitely.  Tr. 237.

Plaintiff was treated at Cooper Clinic from 2004 through 2008 for various impairments.  In January 2007, Plaintiff complained of neck pain, tingling and numbness in her left arm, trouble with diabetes control, and gastroesophageal reflux disease ("GERD").  Tr. 399.  A 2006 MRI of Plaintiff's cervical spine revealed no significant abnormalities.  Tr. 437.  Wanda McMicheal, M.D., assessed Plaintiff with neck pain, non-insulin-dependent diabetes mellitus, and shoulder pain.  Tr. 399.  She prescribed Robaxin, Enalapril, and a TENS unit, administered trigger point injections, and increased Plaintiff's dosage of Actos.  Tr. 399.  In February 2007, Plaintiff was treated for bronchitis.  Tr. 397.  Chest x-rays revealed no definite acute infiltrates, but indicated degenerative joint disease of the thoracic spine.  Tr. 436.

In August 2007, Dr. McMicheal noted that Plaintiff's diabetes was well-controlled and her blood sugars were below the 130s range.  Tr. 395.  However, Plaintiff's Hemoglobin A1C level was 8.1%, which revealed poor overall control of her diabetes mellitus.[2]  Tr. 416.  At this time, Plaintiff's TSH level was high (5.94) and Plaintiff was recommended a low dose of Synthroid, which she refused.  Tr. 415.  Additionally, Plaintiff complained of left shoulder pain, for which she was given trigger point injections.  Tr. 395.  X-rays of Plaintiff's left shoulder revealed no fractures, dislocations, or bony abnormalities.  Tr. 435.  In December 2007, Plaintiff complained of joint, back, and neck pain.  Tr. 393.  An MRI of Plaintiff's left shoulder revealed minimal supraspinatus tendonitis, but no evidence of a rotator cuff tear.  Tr. 434.  At this time, Dr. McMicheal suspected fibromyalgia.  Tr. 393.  In January 2008, Plaintiff Hemoglobin A1C level was 6.6%, which was within the optimal blood sugar control range.  Tr. 412.  Plaintiff's sedimentation rate revealed some

---

[2] A Hemoglobin A1C level of 7% or lower is considered optimal.  Tr. 416.

non-specific inflammation, but April 2008 testing showed improvement.  Tr. 406, 410.  By August

2008, Plaintiff's sedimentation rate was within the normal range.  Tr. 563.

 In January 2008, Plaintiff saw Jeffrey K. Evans, M.D., with complaints of left shoulder pain.

Tr. 382-387.  Upon examination, Plaintiff had full range of motion in her cervical spine and full

muscle strength in her upper extremities, but was tender in her left shoulder.  Tr. 384.  She had

forward flexion of the left shoulder to 120 degrees, abduction to 120 degrees, external rotation to 80

degrees, and internal rotation to L3.  Tr. 384.  Testing revealed impingement of the left side.  Tr. 384.

X-rays of the left shoulder showed a Bigliani Type II acromion, but no fractures, dislocations, or

other bony abnormalities.  Tr. 384, 387.  An MRI of the left shoulder revealed a bony impingement

of the acromion with a small amount of fluid in the glenohumeral joint.  Tr. 384.  Dr. Evans assessed

Plaintiff with left shoulder impingement syndrome, gave her pain injections, and referred her to

physical therapy for range of motion and periscapular muscle strengthening.  Tr. 384-385, 519-522.

Physical therapy progress notes reveal that Plaintiff's shoulder was "slowly improving" and she was

complying with her home exercise program.  Tr. 519.  At a follow-up appointment on February 21,

2008, Dr. Evans assessed Plaintiff with a left frozen shoulder, or adhesive capsulitis.  Tr. 382.  He

recommended that Plaintiff proceed with a left shoulder arthroscopy and a manipulation under

anesthesia.  Tr. 382.

 In February 2008, Plaintiff presented to Dr. McMicheal with diffuse tenderness of the

paraspinal muscle of the cervical and thoracic spine and limited range of motion in her left shoulder.

Tr. 392.  Plaintiff also complained of knuckle pain in her hands, elbow pain, knee pain, and

weakness of the left hand.  Tr. 391.  She stated physical therapy had not helped her.  Tr. 391.

However, she stated Mobic helped "some" and Ultram helped "a lot."  Tr. 391.  Dr. McMicheal

-4-

increased Plaintiff's dosage of Lyrica and prescribed Etodolac.  Tr. 391.  She also referred Plaintiff

to a rheumatologist.  Tr. 391.  By April 2008, Plaintiff's fibromyalgia symptoms had improved on

Lyrica, although she had inflammation in her hands, hips, and knees.  Tr. 389, 410.  Her blood sugars

were below 110, but she still complained of shakiness.  Tr. 389.  Dr. McMicheal added Januvia and

also prescribed Miralax for constipation.  Tr. 389.  In June 2008, Plaintiff complained of continuing

knee and shoulder pain as well as fatigue and memory lapses.  Tr. 492.

In a Physical Residual Functional Capacity ("RFC") Assessment dated May 14, 2008, Alice

M. Davidson, an agency specialist, found that Plaintiff could occasionally lift/carry twenty pounds,

frequently lift/carry ten pounds, stand/walk/sit for about six hours in an eight-hour workday, and

push/pull an unlimited amount, other than as shown for lift/carry.  Tr. 443-450.  She found no

postural, visual, communicative, or environmental limitations, but determined Plaintiff could do no

overhead reaching with her left upper extremity.  Tr. 445-447.  Based on her RFC assessment,

Davidson determined Plaintiff could do light work with no overhead lifting on the left.  Tr. 450.

On May 28, 2008, Plaintiff saw Patricia J. Walz, Ph.D., for a mental diagnostic evaluation.

Tr. 452-457.  Upon presentation, Plaintiff was very guarded, irritable, and sarcastic.  Tr. 452, 455.

Thought processes were logical and goal-oriented and thought content was normal.  Tr. 455.  She

admitted taking Xanax and Celexa for anxiety and depression and stated that her sister had been

diagnosed with terminal cancer.  Tr. 452.  Plaintiff related being physically abused by her mother

as a child and mentally and physically abused by her first husband.  Tr. 453.  When asked about

suicidal or homicidal ideation, Plaintiff stated she was not allowed to think about suicidal ideation

and refused to comment on whether she had thoughts of hurting others.  Tr. 452-453.  She did admit

having a history of panic attacks, but had never received any formal mental health treatment.  Tr.

453.  She denied visual or auditory hallucinations.  Tr. 455.

Plaintiff graduated from high school and earned As and Bs throughout school.  Tr. 453.  She quit her last job in February 2007 due to problems with one of her co-workers and being unable to take her medicine.  Tr. 454.  When asked about activities of daily living, Plaintiff responded that her husband helped her get dressed, she could do chores at home but could not lift or reach over her head, and did minimal cooking.  Tr. 454.  She had no trouble with math, managing money, or reading, although her ability to comprehend depended on the day.  Tr. 453.  She reported attending a Bible class, grocery shopping, talking to friends on the phone, and reading to pass the time.  Tr. 456.

Dr. Walz estimated Plaintiff's IQ to be within the low average to average range.  Tr. 455-456.  She noted that Plaintiff's social skills were impaired by irritability and she persisted in tasks, although she was quite slow.  Tr. 456.  Dr. Walz diagnosed Plaintiff with panic disorder without agoraphobia, probable somatoform pain disorder, and avoidant traits.  Tr. 456.  She estimated Plaintiff's Global Assessment of Functioning ("GAF") score at 50-55.  Tr. 456.

On June 10, 2008, Plaintiff presented to Fort Smith Rheumatology with complaints of fibromyalgia and increasing hand, hip, and knee pain.  Tr. 479-489.  Upon examination, Plaintiff had good range of motion in her shoulders, elbows, and wrists, but experienced some pain with left shoulder abduction.  Tr. 480.  Trace swelling and tenderness were noted in the metacarpophalangeal ("MCP") and proximal interphalangeal ("PIP") joints, although there was no active synovitis of the MCPs and no rheumatoid nodules.  Tr. 480.  Plaintiff had good range of motion in her hips, knees, and ankles, although there was some moderate tenderness noted.  Tr. 480.  Plaintiff exhibited no neurological deficits.  Tr. 480.  Russell B. Branum, M.D., assessed Plaintiff with possible

inflammatory arthritis given PIP swelling and her slightly elevated sedimentation rate of 35, and ordered further testing.  Tr. 480, 482.  Rheumatoid factor testing was within the normal range.  Tr. 487.  X-rays of Plaintiff's hands revealed minimal osteoarthritic changes, but nothing to suggest inflammatory arthritis.  Tr. 489.  Foot x-rays revealed minimal schlerosis consistent with osteoarthritis.  Tr. 489.

In a Psychiatric Review Technique dated June 11, 2008, Dan Donahue, an agency specialist, found that Plaintiff did not meet the criteria for Listings 12.06 (anxiety-related disorders), 12.07 (somatoform disorders), and 12.08 (personality disorders), and had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration.  Tr. 460-473.  In a Mental RFC Assessment, Donahue found that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workday and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the workplace.  Tr. 474-477.  Donahue found no other significant limitations.  Tr. 474-477.  Based on this RFC Assessment, Donahue determined Plaintiff could perform work where interpersonal contact is incidental to the work performed, e.g., assembly work, where complexity of tasks is learned and performed by rote with few variables and little judgment, and where the supervision required is simple, direct, and concrete.  Tr. 476.

-7-

In a Physical RFC Assessment dated July 23, 2008, Jim Takach, an agency specialist, reviewed Plaintiff's medical records and determined she retained the RFC to occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, and stand/walk/sit for about six hours in an eight-hour workday, but could do no overhead pushing/pulling with her left upper extremity.  Tr. 531-542. Takach found that Plaintiff could occasionally balance, stoop, kneel, crouch, crawl, and climb, and could do unlimited handling, fingering, and feeling, but was limited in her ability to reach in all directions.  Tr. 533-534.  He found no visual, communicative, or environmental limitations, except that Plaintiff must avoid concentrated exposure to hazards, such as machinery or heights.  Tr. 534-535.

On August 24, 2008, Dr. McMicheal completed a Medical Source Statement (Physical), in which she determined Plaintiff suffered from fibromyalgia, left shoulder pain, back pain, and hand pain and swelling.  Tr. 545.  She found Plaintiff could sit or stand continuously for fifteen minutes and for a total of two hours per workday and walk for less than fifteen minutes continuously and for a total of one hour per workday.  Tr. 545.  She determined Plaintiff could be on her feet either standing or walking for a total of two hours per workday.  Tr. 545.  Dr. McMicheal found that Plaintiff could occasionally lift/carry one to five pounds and could not perform simple grasping, pushing/pulling, or fine manipulation with either hand, but could use both feet for repetitive movements although some days would be difficult.  Tr. 546.  She further found that Plaintiff would need unscheduled breaks during the workday, would have bad days, and would likely miss more than four workdays per month.  Tr. 546.

In August 2008, Plaintiff went to Cooper Clinic for routine follow-up.  Tr. 564.  Blood tests revealed that Plaintiff's TSH levels were too high, and Dr. McMicheal recommended that she restart

Synthroid.  Tr. 564.  Plaintiff also complained that she had a cyst in her right forearm, back and shoulder spasms, leg weakness, hip pain, and inflammation and weakness in her hands.  Tr. 553. By October 2008, Plaintiff's forearm cyst was improving and "not hurting much."  Tr. 551.  Dr. McMicheal also noted that Plaintiff's blood sugars were good.  Tr. 551.  In December 2008, Plaintiff was treated for bronchitis and wrist pain.  Tr. 549.  X-rays of Plaintiff's left wrist revealed no fractures, dislocations, or arthritic changes.  Tr. 566.  In January 2009, Plaintiff complained of wrist, shin, and shoulder pain, insomnia, and depression.  Tr. 548.  Dr. McMicheal increased Plaintiff's dosage of Cymbalta and Lyrica, prescribed Ambien for sleep, and instructed Plaintiff to use Darvocet for pain control.  Tr. 548.

In February 2009, Plaintiff saw Michael S. Wolfe, M.D., for complaints of bilateral wrist pain, worse on the right.  Tr. 568.  Physical examination revealed intact motor and sensory function with good pulses.  Tr. 568.  Plaintiff had good range of motion of the elbows and wrists, but was markedly tender over the first extensor compartments bilaterally, with a positive Finkelstein.  Tr. 568.  X-rays of the wrists were essentially within normal limits.  Tr. 568.  Dr. Wolfe assessed Plaintiff with bilateral De Quervain's tendinitis,[3] administered pain injections in the right wrist, and ordered a cockup wrist splint with a thumb post.  Tr. 568.

On March 17, 2009, Plaintiff had an MRI of her left wrist, which revealed fluid collection along the volar aspect of the wrist and deep into the pronator quadratus muscle possibly due to tenosynovitis or ganglion.  Tr. 601.  Fluid was also present in the radioulnar joint space.  Tr. 601.

---

[3] De Quervain's Syndrome (Washerwoman's Sprain) is "stenosing tenosynovitis of the short extensor (extensor pollicis brevis) and long abductor tendon (abductor pollicis longus) of the thumb within the first extensor compartment."  It usually occurs after repetitive use of the wrist, although it occasionally occurs in association with rheumatoid arthritis.  The major symptom is aching pain at the wrist and thumb, aggravated by motion.  *Merck*, *supra* note 1, at 336.

No gross perforations were seen, although a tiny focal perforation could not be ruled out.  Tr. 601.
An MRI of the right wrist revealed probable arthritic process as evidenced by fluid in the radiocarpal
and intercarpal joint spaces, trace fluid in the radioulnar joint space, and mild increased signal
intensity in the median nerve.  Tr. 601.  However, no focal erosions were seen and the bony
structures showed no definite abnormalities.  Tr. 601.  On March 24, 2009, Plaintiff's dosage of
Synthroid was increased due to elevated TSH levels.  Tr. 599.  Additionally, Plaintiff's Hemoglobin
A1C level was elevated to 9.2.  Tr. 598.  As a result, Plaintiff's dosage of Januvia was increased and
she was prescribed Glucotrol .  Tr. 598.  In June 2009, Plaintiff was treated for bronchitis and given
samples of Cymbalta for moodiness and irritability.  Tr. 593.  She was also referred back to Dr.
Branum for management of her fibromyalgia.  Tr. 593.  In September 2009, Dr. McMicheal noted
that Plaintiff's fibromyalgia was severe and her pain was not well-controlled.  Tr. 591.  She was also
assessed with right hand and arm pain.  Tr. 591.  In October and November 2009, Plaintiff was
treated for bronchitis and an upper respiratory infection.  Tr. 585, 589.  At this time, Plaintiff still
experienced severe pain, but stated that Hydrocodone somewhat helped.  Tr. 587.

## III.   **Applicable Law**

The Court's role on review is to determine whether the Commissioner's findings are
supported by substantial evidence in the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583
(8th Cir. 2003).  "Substantial evidence is less than a preponderance, but enough so that a reasonable
mind might accept it as adequate to support a conclusion."  *Estes v. Barnhart*, 275 F.3d 722, 724 (8th
Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)).  In determining whether
evidence is substantial, the Court considers both evidence that detracts from the Commissioner's
decision as well as evidence that supports it.  *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000)

-10-

(citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that he is unable to engage in any substantial gainful activity due to a  medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A).  The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the RFC to perform his past relevant work; and (5) if the claimant cannot perform his past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given his age, education, and work experience.  *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a).  If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled.  *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

## IV.    <u>Discussion</u>

At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity at any point since February 14, 2007, the alleged onset date. Tr. 52.  At step two, the ALJ found that

Plaintiff suffered from fibromyalgia, osteoarthritis, anxiety, and Hashimoto's disease, all of which were considered severe impairments under the Act.  Tr. 52.  At step three, he determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  Tr. 52-53.  At step four, the ALJ found that Plaintiff had the RFC to lift/carry twenty pounds occasionally and ten pounds frequently, sit/stand/walk for about six hours in an eight-hour workday, occasionally climb, balance, stoop, kneel, crouch, and crawl, but could not reach overhead with her left upper extremity and must avoid concentrated exposure to hazards such as unprotected heights or heavy machinery.  Tr. 53-56.  Mentally, the ALJ determined Plaintiff could perform unskilled work where interpersonal contact is incidental to the work performed.  Tr. 53-56.  With these limitations, the ALJ found that Plaintiff could no longer perform any of her past relevant work. Tr. 56.  However, with the aid of a vocational expert, he determined there were jobs existing in significant numbers in the national economy that Plaintiff could perform, including representative occupations such as hotel maid, of which there are 630,000 jobs nationally and 5,300 locally, sorters, of which there are 46,000 jobs nationally and 1,200 locally, and cashier, of which there are 400,000 jobs nationally and 17,000 locally.  Tr. 57.  Thus, at step five, the ALJ determined Plaintiff was not under a disability at any time between February 14, 2007, and October 2, 2009.  Tr. 57-58.

Plaintiff contends that the ALJ erred in his RFC assessment.  *See* Pl.'s Br. 8-16.  This court agrees.  At the fourth step of the evaluation, a disability claimant has the burden of establishing his RFC.  *Eichelberger*, 390 F.3d at 591; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  A claimant's RFC is the most he can do despite his limitations.  20 C.F.R. § 404.1545(a)(1).  The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her

-12-

limitations." *Masterson*, 363 F.3d at 737.  The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be "some medical evidence" to support the ALJ's determination. *Eichelberger*, 390 F.3d at 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir 2000).

The ALJ determined Plaintiff's wrist impairments and fibromyalgia were not objectively verifiable by the medical evidence.  Tr. 53-56.  In making this determination, he noted that x-rays of Plaintiff's left wrist dated December 2008 revealed no fractures, dislocations, or arthritic changes. Tr. 56, 566.  Additionally, he found that although Plaintiff was prescribed a wrist splint by Dr. Wolfe, physical examination revealed good range of motion in the wrists with "good stability, good strength, and good alignment."  Tr. 56, 568.  However, subsequent MRI findings revealed fluid collection in the left wrist, possibly related to tenosynovitis or ganglion, and probable arthritic process of the right wrist, as evidenced by fluid in joint spaces and mild increased signal intensity in the median nerve.  Tr. 601.  Moreover, Dr. Wolfe assessed Plaintiff with De Quervain's syndrome, administered pain injections in Plaintiff's right wrist, and ordered a cockup wrist splint with a thumb post.  Tr. 568.  Despite these findings, the ALJ placed no restrictions on Plaintiff's ability to handle, finger, and push or pull.  Tr. 53-56.  This was error.

In Dr. McMicheal's Medical Source Statement, she determined Plaintiff could not perform simple grasping, pushing/pulling, or fine manipulation with either hand.  Tr. 546; *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009) (A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in a clamant's record).  The ALJ rejected her

opinion, finding that it was outweighed by the opinions of Dr. Branum and the agency specialists. Tr. 56. However, Dr. Branum only met with Plaintiff on one occasion and never offered an opinion on Plaintiff's exertional limitations. *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (the assessment of a doctor who evaluates a claimant once or not at all does not usually constitute substantial evidence). Moreover, the agency specialists merely reviewed Plaintiff's records and did not physically examine her. *Id.*

The ultimate issue of disability is one reserved to the Commissioner. *Brown v. Astrue*, 611 F.3d 941, 952 (8th Cir. 2010); *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("treating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed"). In this instance, however, Dr. McMicheal's assessment is not merely a conclusory medical opinion. She treated Plaintiff consistently throughout the relevant time period and completed a detailed Medical Source Statement, in which she specifically attributed Plaintiff's wrist limitations to stiff and painful hands. Tr. 278, 295-298. Additionally, she continually noted that Plaintiff's fibromyalgia was severe and her pain was not well-controlled by medication. Tr. 591. If there was any ambiguity, the ALJ had a duty to contact Dr. McMicheal and seek clarification. *See* 20 C.F.R. § 404.1512(e) (when evidence from a treating physician is inadequate to determine whether a claimant is disabled, we will seek additional evidence or clarification). Dr. McMicheal was the only *treating* physician to complete an RFC assessment. As Plaintiff's treating physician, she was in the best position to assess Plaintiff's limitations. For these reasons, the ALJ did not give adequate reasons for dismissing Dr. McMicheal's opinion. As such, further development is necessary to determine the ultimate issue of Plaintiff's disability.

-14-

On a final note, the ALJ did not adequately assess Plaintiff's limitations resulting from her fibromyalgia. The ALJ used the absence of objective radiographic findings to support his determination that Plaintiff was not entirely credible. Tr. 53-56. This was error. Fibromyalgia is a chronic condition for which there are no confirming diagnostic tests. *Garza v. Barnhart*, 397 F.3d 1087, 1089 (8th Cir. 2005). Here, Plaintiff consistently complained of muscle spasms, weakness, pain, and inflammation. Additionally, despite taking various medications, including Lyrica and Cymbalta, Plaintiff's fibromyalgia symptoms did not improve. Tr. 591, 593. For the aforementioned reasons, this case should be remanded to the ALJ for further development of the record concerning Plaintiff's RFC.

The court finds that substantial evidence does not support the ALJ's RFC assessment. On remand, the ALJ should direct interrogatories to Dr. Branum, asking him to review Plaintiff's medical records during the relevant time period, complete an RFC assessment regarding Plaintiff's exertional limitations, and give the objective basis for his opinion, so that an informed decision can be made regarding Plaintiff's ability to perform basic work activities on a sustained basis. *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985). Additionally, if further clarification is needed from Dr. McMicheal, the ALJ should attempt to contact her. Once a proper assessment is completed, the ALJ should reconsider whether Plaintiff's RFC allowed her to engage in substantial gainful employment during the relevant time period.

## V.    <u>Conclusion</u>

Accordingly, the ALJ's decision denying benefits to Plaintiff is not supported by substantial evidence and should be reversed. This matter should be remanded to the Commissioner for further development of the record.

ENTERED this 26th day of May 2011.

/s/ J. Marschewski
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE